## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DAVID A. WALKER, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No.:  2:19-cv-00701-RDP |
| v. | ) ) | |
| ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY and CCC INFORMATION SERVICES, INC., | ) ) ) | CLASS REPRESENTATION **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff David A. Walker, Individually and on Behalf of all Others Similarly Situated ("Plaintiff"), by and through the undersigned counsel of record, files this First Amended Class Action Complaint against Defendants, Allstate Property & Casualty Insurance Company ("Allstate") and CCC Information Services, Inc. ("CCC") (collectively, "Defendants"), pursuant to Fed. R. Civ. P. 15(a)(2) and the Stipulation of Defendants Allstate and CCC.  The only substantive change to the original Complaint is the addition of the factual allegations at Section D, "Condition Adjustments to Comparable Vehicles," ¶¶ 38-46; Section I, "Allstate Has Waived and is Estopped to Assert the Appraisal Provision," ¶¶ 72-91; and the addition of the last sentence to paragraph 2.

## NATURE OF THE ACTION

1.      This Alabama class action arises from Defendants' systemic and intentionally wrongful under-valuation of total losses involving the vehicles of Allstate first party insureds.

2.      Allstate has spent many tens of millions of dollars to market itself as a fair and honest insurance company. However, Allstate is not fair and honest in providing valuations to

Allstate insureds whose vehicles have been involved in an accident and are determined to be a total loss. Allstate has saved hundreds of millions of dollars throughout the United States as a result of the improper scheme alleged herein.

3.     Through its auto insurance policy contracts, Allstate has agreed to provide, *inter alia*, collision coverage for losses resulting from damage to insureds' vehicles. When the costs of repairs exceed a specified percentage of the vehicle's value, Allstate declares the vehicle a total loss and must fairly adjust that total loss claim by properly valuing the insured vehicle.

4.     Allstate has contracted with CCC (the "Agreement") to receive Market Valuation Reports ("CCC Reports") to determine the "Base Vehicle Value" of a total loss vehicle and the "Adjusted Vehicle Value" after any "Condition Adjustments" and applicable deductible. Through this Agreement with CCC, Allstate and CCC have engaged in a scheme to artificially deflate the value of total loss claims with the specific intent to pay first party insureds less than the actual pre-loss value of total loss vehicles by making improper downward Condition Adjustments.

5.     Plaintiff and the putative Class are Allstate automobile insurance policy holders whose vehicles Allstate determined to be a total loss, and who have been subject to Allstate and CCC's scheme to artificially deflate the value of their total loss claims by making such improper downward Condition Adjustments.

6.     When it entered into the Policies at issue in this case with Plaintiff and Class Members, Allstate was aware, but failed to disclose to Plaintiff and the Class, that CCC's Reports would wrongfully undervalue total loss vehicles and that Allstate would intentionally underpay total loss claims based on the CCC Reports. Through this scheme, Allstate and CCC have engaged in unlawful conduct in violation of Alabama law, and their respective contractual obligations and

have thereby uniformly damaged Allstate insureds in Alabama in a readily ascertainable dollar amount.

<strong><u>PARTIES, JURISDICTION AND VENUE</u></strong>

7.     Plaintiff David A. Walker is an adult citizen of Birmingham, Alabama.

8.     Plaintiff brings this action in his individual capacity and on behalf of the Class of all other persons similarly situated in the state of Alabama.

9.     Defendant Allstate Property & Casualty Insurance Company is a foreign corporation operating under the laws of the state of Illinois with its principal place of business in Northbrook, Illinois.  Allstate issued automobile liability insurance Policies, including coverage for property damage and first-party total loss claims, to Plaintiff and Class Members, and many thousands of other insureds who have not incurred a total loss in Alabama.  Allstate is subject to general and specific jurisdiction in Alabama.

10.     Defendant CCC Information Services, Inc. is a foreign corporation operating under the laws of the state of Illinois with its principal place of business in Chicago, Illinois.  CCC has entered into a contract with Allstate to prepare and provide all Allstate total loss insureds with purported valuations for total loss vehicles in the form of CCC Reports throughout the class period.

11.     CCC has received very substantial payments from Allstate for total loss vehicle valuations.

12.     CCC has provided thousands of total loss valuations for Allstate insureds in Alabama.  CCC also provides CCC total loss valuations for thousands of Alabama insureds of other insurance companies.  CCC has engaged in the total loss valuation business in Alabama and has committed tortious acts in Alabama, as alleged herein.   CCC is subject to jurisdiction under the Alabama Long-Arm Statute, Ala.R.Civ.P. 42.

13.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a Class Action in which Members of the Class are citizens of a state different from each of the Defendants.

14.     Venue is proper pursuant to 28 U.S.C. §1391 in that Plaintiff resides in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants are authorized to conduct, or actually conduct, business in this District and have intentionally availed themselves of the laws and markets within this District through distribution and sale of their products and services (insurance policies and total loss valuations, respectively) in this District, do substantial business in this District.

## GENERAL FACTUAL ALLEGATIONS

**A.      Plaintiff's Allstate Policy**

15.     Plaintiff David A. Walker was the owner of a 2008 Subaru Impreza Sedan (the "Vehicle").

16.     Allstate issued its Automobile Policy No. 0455477893 (the "Policy") to Plaintiff which insured the Vehicle. That Policy was in effect in May, 2017.

17.     Following an automobile accident on May 5, 2017, Allstate determined that Plaintiff's Vehicle was a total loss.

18.     The terms of Allstate's Policy issued to Plaintiff are not individualized, unique or specific to Mr. Walker. Plaintiff's Policy is the same standard form issued by Allstate to insureds throughout the state of Alabama.

4

19.     Specifically, Part 4 of the Policy, relating to "Protection Against Loss to the Auto" provides for "Payment of Loss" and "Limits of Liability."  See Allstate's Standard Automobile Policy, attached and incorporated herein as Exhibit A.

20.     The "Payment of Loss" provision allows Allstate to pay for a loss in money, or repair or replace the vehicle. (Exhibit A, p. 26). Here, Allstate elected to pay money.

21.     The "Limits of Liability" provides that, in the case of a total loss, Allstate's limit of liability is "actual cash value of the property… at the time of the loss." ("Actual Cash Value"). Thus, Allstate is required to pay Plaintiff such Actual Cash Value.  (Exhibit A, p. 26)

22.     CCC provided Allstate with a CCC Market Valuation Report for Plaintiff's Vehicle on or about May 11, 2017 (the "May Report").  CCC Reports are discussed in detail in Section B, immediately below.

23.     The May Report purports to state a "Base Vehicle Value" of $6,979.00 and an "Adjusted Vehicle Value" of $6,590.00, after a negative or downward "Condition Adjustment" in the amount of $389.00. Allstate then added vehicular tax and Department of Motor Vehicle ("DMV") fees and subtracted a deductible of $500.00 for a "Total" of $6,394.81.  A true and correct copy of the May Report is attached and incorporated herein as Exhibit B.

24.     After Plaintiff protested, Allstate provided Plaintiff with a second CCC Report dated June 6, 2017 (the "June Report").

25.     Plaintiff's June Report purports to state a Base Vehicle Value in the amount of $7,338.00, and an Adjusted Vehicle Value of $6,949.00 after the same negative Condition Adjustment in the amount of $389.00.  A true and correct copy of Plaintiff's June Report is attached and incorporated herein as Exhibit C.

26.     As in the case of the May Report, Allstate added vehicular taxes and DMV fees and subtracted the $500.00 deductible for a Total of $6,769.52 in the June Report.

27.     Both the May and June Reports failed to properly value Plaintiff's vehicle and did not properly pay Actual Cash Value which Allstate owed to the Plaintiff.

**B.     The Allstate and CCC Contract**

28.     Allstate and CCC entered into a contract to provide CCC Market Valuation Reports to Allstate insureds such as Plaintiff and the Class. As explained in detail below, CCC Reports (the "Reports" or "CCC Reports") include purported market values of total loss vehicles based upon improper and unlawful methodologies.

29.     The Agreement between Allstate and CCC is described on the first page of each Report as follows:

> The CCC ONE® Market Valuation Report reflects CCC Information Services Inc.'s opinion as to the value of the loss vehicle, based on information provided to CCC by Allstate Property & Casualty.

*Id.* at p. 1.

30.     The Reports specifically bear the names of both CCC and Allstate on the first page of each Report.

31.     In addition, each Report has the name, Alabama address, and the claim number of the individual Allstate insured whose total loss vehicle is the subject of the Report. Thus, Plaintiff's claim information, including Plaintiff's name and address, appear on this first page of Plaintiff's Report.

32.     Each CCC Report contains a Valuation Methodology, which is described on the second page of each Report.  (See Plaintiff's Reports, Exhibits B and C at p. 2)

### C.   The CCC Methodology

33.    The CCC Valuation Methodology ("CCC's Methodology") is explained in Plaintiff's Reports as a four-step process used to determine the valuation.

34.    This four-step process includes:

      Step 1 – Claim Inspection

      Step 2 – Database Review

      Step 3 – Search for Comparables

      Step 4 – Calculate Base Vehicle Value

(Exhibits B and C at p. 2).

35.    Steps 2, 3, and 4 are not based on statistically valid methodologies, algorithms, values or computations. Each step is, in fact, statistically invalid and does not result in a proper valuation of Actual Cash Value for total loss vehicles in Alabama.

36.    As discussed on page 2 of Plaintiff's Reports, CCC uses this purported Methodology to calculate the Base Vehicle Value.

37.    The Base Vehicle Value is set out on page 1 of Plaintiff's Reports under the heading "Valuation Summary."

### D.   Condition Adjustments to Comparable Vehicles

38.    The format for CCC Reports varies somewhat as to detail.  However, in the case of each Market Valuation Report, CCC selects "Comparable Vehicles" identified in its database search. Using its Valuation Methodology, CCC then makes purported adjustments to these Comparable Vehicles.

39. CCC's Methodology for selecting Comparable Vehicles is statistically flawed and invalid, and, further, it is skewed towards identifying and utilizing Comparable Vehicles which are under-valued and do not fairly reflect Actual Cash Values.

40. CCC's adjustments to Comparable Vehicles include adjustments for year/model/trim, options, mileage, and condition. This is reflected on page 9 of the Reports. None of these purported Comparable Value Adjustments are statistically valid or justifiable. Adjustments for purported condition of Comparable Vehicles are hereinafter referred to as "Comparable Vehicle Condition Adjustments".

41. Specifically, in Plaintiff Walker's Reports, CCC made negative or downward Condition Adjustments in exactly the same amount (-$642) to each of the Comparable Vehicles. There is no statistically valid or other proper basis for this negative or downward Condition Adjustment with respect to each of the Comparable Vehicles.

42. CCC has no actual or accurate knowledge or information regarding the actual condition of Comparable Vehicles which it has not inspected.

43. The note on page 9 states that "the Condition Adjustment sets that comparable vehicle to Private Owner condition, which the loss vehicle is also compared to in the Vehicle Condition Section."

44. There is no accurate or statistically valid set of facts under which this purported "process" could result in a downward Condition Adjustment in exactly the same amount of -$642 for each of the three comparable vehicles.

45. The Base Vehicle Value reflected on the first page of every CCC Report is calculated by averaging the purported value of Comparable Vehicles after Comparable Vehicle Condition Adjustments.

46.     Thus, the direct effect of these Comparable Vehicle Condition Adjustments, is to reduce the Base Vehicle Value of the Walker vehicle by approximately $642.00.  CCC follows this same practice in each case in which CCC makes negative or downward Comparable Vehicle Condition Adjustments.

**E.     Condition Adjustment to the Total Loss Vehicle**

47.     After determining the Base Vehicle Value, CCC then adjusts (and typically reduces) the Base Vehicle Value by making an additional Condition Adjustment which results in an Adjusted Vehicle Value.

48.     The CCC Methodology for determining a total loss vehicle's Vehicle Condition is explained as follows:

> Allstate Property & Casualty uses condition inspection guidelines to determine the condition of key components of the loss vehicle prior to the loss. The guidelines describe physical characteristics for these key components, for the condition selected based upon age. Inspection Notes reflect observations from the appraiser regarding the loss vehicle's condition.
>
> CCC makes dollar adjustments that reflect the impact the reported condition has on the value of the total loss vehicle as compared to Private Owner condition. These dollar adjustments are based upon interviews with dealerships across the United States.

*Id*. at 6.

49.     Allstate's "guidelines" used to determine the "condition of key components… based upon age" of a total loss vehicle, are statistically invalid.

50.     In addition, CCC's Methodology for determining a total loss vehicle's condition by making "dollar adjustments" based upon "interviews with dealerships," is statistically invalid and does not provide a proper basis for determining the condition of a total loss vehicle, or the proper dollar amount of the Condition Adjustment.

51.     The dealer interviews do not provide any proper basis for such negative Condition Adjustments to the Plaintiff's vehicle or other total loss vehicles.

###     F.     **Summary Regarding Condition Adjustments**

52.     The dollar amounts assigned to Condition Adjustments in the CCC Reports to the Comparable Vehicles and to the total loss vehicle (collectively "Condition Adjustments") are wholly arbitrary and are not based on any statistical, objective, valid, or verifiable data. Accordingly, all such downward Condition Adjustments are improper in all respects and should be disregarded in valuing an Allstate insured's total loss vehicle.

53.     Because CCC's calculation of both Base Vehicle Value and the Condition Adjustments is statistically invalid, CCC's calculation of Adjusted Vehicle Value does not properly reflect the Actual Cash Value that Allstate is contractually obligated to pay insureds pursuant to the auto insurance policy contracts it issues throughout Alabama. (Exhibit A, p. 26).

54.     The intended and wrongful result of the four steps and, specifically, the Condition Adjustments included in the CCC Methodology, is that total loss vehicles are undervalued, and Allstate insureds' total loss claims are underpaid. This underpayment is a detriment to Allstate insureds, including Plaintiff and Class Members, and a benefit to Defendants.  Rather than paying Plaintiff and Class Members the proper sum of money for their total loss vehicles, Allstate has retained significant funds in the millions of dollars by underpaying Plaintiff and Class Members for the value of their total loss vehicles.

55.     The great majority of CCC Reports include one or both types of downward Condition Adjustments.

###     G.     **Allstate's Use of the Unlawful CCC Valuations**

56.     Allstate contracted with CCC to receive the CCC Reports.

57.     CCC provided Allstate with Reports for the total loss vehicles of the Plaintiff and the Class.

58.     Allstate has a regular practice of informing insureds that the CCC Reports properly establish Actual Case Value and provide the basis for proper payment of total loss claims under Allstate Policies in Alabama.

59.     Allstate has the regular and systemic claims practice of settling total loss claims based upon the CCC Reports.

60.     The Base Vehicle Value and the Adjusted Vehicle Value, including negative Condition Adjustments identified in the CCC Reports for vehicles of Plaintiff and Class Members, result in an underpayment of such total loss claims in the dollar amount of the Condition Adjustment.  The great majority of Allstate total loss claims in Alabama are, in fact, settled on the basis of the CCC Reports.

61.     Allstate has actual knowledge that the CCC Methodology is statistically invalid and unlawful.

62.     Allstate has suppressed and concealed material facts relating to CCC's Market Valuation System and its pre-existing scheme in conspiracy with CCC to intentionally undervalue total loss claims, including those of Plaintiff and the Class. Specifically, Allstate concealed from Plaintiff that its purported total loss valuations were based upon the statistically invalid and unlawful CCC Valuation Methodology.

63.     Plaintiff and the Class Members have been damaged by Allstate's systemic underpayment of total loss claims.  This underpayment results from Allstate's intentional failure to fairly and properly determine Actual Cash Value and its knowingly improper downward Condition Adjustments.

### H.    __Guidebook Values__

64.    Other entities involved in the automobile business, such as new and used car dealers, and banks and other lending institutions, have *never* used CCC Reports as a basis for determining a fair valuation or Actual Cash Value of used vehicles.

65.    Such entities have historically used industry-recognized guidebooks as sources for proper used vehicle valuation ("Guidebooks").  These Guidebooks include NADA, Kelly Blue Book and Black Book.  These Guidebooks are a proper source for determining Actual Cash Value.

66.    Historically, insurers also used Guidebooks for the purpose of determining proper valuations of total loss vehicles and Actual Cash Value.  Indeed, many insurers continue to use the Guidebooks to determine Actual Cash Value when determining whether a vehicle can be repaired or must be declared a total loss.

67.    For example, insurers typically declare a vehicle to be a total loss if the estimated repair costs exceed a percentage, such as 80%, of the pre-loss vehicle valuation.

68.    It is typically in the insurer's best interest to establish a higher value of the vehicle for this purpose, so that the cost of repair is a smaller percentage of the pre-crash vehicle valuation.

69.    However, a number of years ago, insurers determined that they could save substantial amounts of money by using third-party valuations prepared by either CCC or a joint venture of J.D. Power/Mitchell.

70.    Accordingly, in the last twenty years, many insurers have adopted the regular practice of using CCC or Power/Mitchell valuations of total loss vehicles, and disregarding the historically-recognized Guidebooks as a source of valuation, to improperly save millions of dollars in adjusting total loss claims.

71.     The valuation products of CCC and Power/Mitchell are not used or recognized by any other "player" in the automobile industry, including dealers or lending institutions.

I.      **Allstate Has Waived and is Estopped to Assert the Appraisal Provision**

72.     Allstate's Preexisting Appraisal Scheme:   During the relevant period of time, Allstate had, and continues to have, a standard practice of refusing to negotiate the Base Vehicle Value and Adjusted Vehicle Value as reflected in the CCC Reports unless CCC has, for example, omitted an option.  Specifically, CCC has a regular practice of refusing to negotiate in good faith with respect to comparable vehicles, mileage adjustments for comparable vehicles, condition adjustments to the specific total loss vehicle, or comparable vehicle condition adjustments.

73.     Allstate knows that its insureds typically have no practical choice other than to accept the total loss payment offered by Allstate simply because the insured needs those monies to purchase a replacement vehicle.

74.     Further, an insured cannot wait on the appraisal process.  Allstate also has a regular practice of threatening to withdraw its offer to pay a total loss if the insured requests an appraisal. An appraisal process, including selection of an umpire may take forty-five (45) days or more.

75.     This threat of withdrawal of its offer, combined with delay and expense to the insured of an appraisal, as alleged below, present bad faith obstacles to a fair appraisal.  Allstate simply "stands pat" unless it is sued.

76.     Allstate knows that if Allstate insists on "standing" on the CCC valuation, the great majority of insureds will simply capitulate and take the Allstate total loss payment.

77.     Allstate also had, and continues to have, a regular practice that Allstate does not demand an appraisal unless and until an insured files a lawsuit.  Allstate does not include the appraisal provision in its policies for the appropriate purpose of a cheap and efficient resolution,

on a timely basis, of disputed first party total loss claims.  As stated, even where there is a clear and material dispute with an insured, Allstate does not demand an appraisal unless a lawsuit is filed.

78.     This is well-illustrated by the circumstances of Plaintiff's total loss.  In May, June and July, 2017, immediately following his total loss, Plaintiff Walker sent numerous emails to, and had multiple conversations with, Allstate representatives, including LaQuisha Anderson.  Mr. Walker repeatedly disputed both the first and second CCC valuations and sent information regarding comparable vehicles to Allstate representatives.

79.     For example, Mr. Walker sent a letter dated May 21, 2007, filed herewith as Exhibit D, to Allstate.  Mr. Walker complained that "Allstate refuses to reconsider the offer, to look at the Blue Book value, or to consider the enclosed valuations found on the internet for a vehicle of approximate year, make, model, mileage and condition."  Mr. Walker specifically stated that, "By this letter, I hereby contest the [CCC] appraised value, make notice of my dissatisfaction with the claims experience, and request a fair and equitable settlement of the claim."

80.     In addition, Plaintiff Walker advised Ms. Anderson verbally that he had obtained photographs of several of the purported comparable vehicles listed in the CCC Valuation Reports from the websites of the "sources" of those vehicles, as listed in the CCC Reports, and had determined that several of the vehicles had exterior or interior damage.

81.     Ms. Anderson informed Mr. Walker by email dated July 10, 2017, "Attached is the updated valuation report.  I have advised you that the total loss valuation is not a negotiation."  The July 10, 2017 email is filed herewith as Exhibit E.

82.     Finally, Plaintiff Walker complained to the Alabama Department of Insurance. The absolute intransigence of Allstate is illustrated, in clear relief, by Allstate's letter dated July 28,

2017 to the Alabama Department of Insurance.  That letter is filed herewith as Exhibit F.  In that letter, Allstate's regional claim leader, Lee Strong, told the Alabama Department of Insurance, "I also discussed with Mr. Walker his right to an appraisal.  He initially advised that he was invoking his rights to appraisal but later called and stated he was not going to use this option because the appraisers that he spoke with were not willing to go against an insurance company."  *Id.*  Still, Allstate did not initiate an appraisal.

83.   <u>Prejudice to Plaintiff Walker and Other Insureds</u>:  Allstate's scheme to not invoke the appraisal unless and until there is litigation materially prejudices Allstate insureds, including Plaintiff, in several material ways.

84.   First, Allstate typically sells the salvaged total loss vehicle to one of two companies, Copart or IAA.  These companies pay a salvage value to Allstate and then market salvaged parts from total loss vehicles.  The total loss vehicle is typically sold by Allstate and salvaged for spare parts in thirty (30) to forty-five (45) days after the total loss.

85.   Allstate has actual knowledge that if an insured disputes Allstate's total loss payment but does not demand an appraisal, the total loss vehicle will be unavailable for inspection and appraisal after such salvage.  Thus, Allstate knows that if it does not request an appraisal for months or even years, and then does so only if and when litigation is filed against Allstate, the total loss vehicle will be unavailable for physical inspection and appraisal.  Plaintiff's vehicle, of course, has been salvaged and is not available for an inspection.

86.   Allstate also knows that industry-recognized information regarding comparable used vehicles listed for sale at the time of a loss from sources such as AutoTrader and Cars.com is no longer current after about ninety (90) days.

87.     The only possible appraisal after the vehicle has been salvaged is what is known in the industry as a "desktop" appraisal, which is based upon the limited information available a year or two years after the total loss.

88.     The prejudice to insureds such as Plaintiff is clearly illustrated by the information regarding the "vehicle condition," which is listed in CCC Reports.  See Exhibits B and C at pp. 6-7.  Consistent with its standard practice, CCC lists purported "component condition" for "interior" (including seats, carpets, dashboard and headliner), "exterior" (including sheet metal, trim, paint, and glass), "mechanical" (including engine and transmission) and "tires."

89.     When the vehicle is unavailable at the time that Allstate demands an appraisal, it is obviously impossible to fairly review the actual condition of each of the listed "component" conditions based upon an inspection.  Thus, Plaintiff has been deprived of the right to proper inspection-based appraisal as a result of Allstate's delay and the salvage of his vehicle.

90.     Cost as a Deterrent to an Appraisal:  In addition, the fact that the appraisal provision requires that the insured pay for the cost of an appraiser and share the expense of a third party umpire is intended by Allstate, and is, in fact, a significant and improper deterrent to insureds such as Plaintiff with regard to invoking the appraisal provision.  This is because the cost to Plaintiff of an in-person inspection by an appraiser, and the fees and expenses of a third party umpire, may well-exceed $1,000.

91.     For all of these reasons, based upon its pre-existing scheme regarding untimely utilization of the appraisal provision and the clear prejudice to insureds such as Plaintiff, Allstate (and CCC) have waived, and are estopped from, invoking the appraisal provision in the Plaintiff's Policy more than two years after the total loss, and, more importantly, more than two years after

16

Plaintiff made strenuous efforts to persuade Allstate to revise its June 6, 2017 valuation and to negotiate the fair Actual Cash Value of Plaintiff's total loss vehicle.

## CLASS ALLEGATIONS

92.     Plaintiff brings this class action individually and on behalf of all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Class consists of:

> All persons and entities that have made first-party claims since May 9, 2013 under an automobile insurance policy issued within the state of Alabama by Allstate whose vehicles were declared a total loss by Allstate and were valued using CCC's total loss valuation system.

93.     Plaintiff excludes from the Class Allstate, CCC, all related entities, subsidiaries or affiliates of said Defendants, any entity in which said Defendants have a controlling interest, and any and all of said Defendants' employees, affiliates, legal representatives, heirs, successors, or assignees.

94.     Plaintiff also excludes from the Class any person or entity that has previously commenced and resolved a lawsuit against said Defendants arising out of the subject matter of this lawsuit.

95.     Plaintiff also excludes from the Class the Judge assigned to this case and any member of the Judge's immediate family.

96.     **The Condition Adjustment Subclass:** This Subclass consists of Alabama insureds whose total loss claims were reduced by negative or downward Condition Adjustments.

97.     **The Market Value Subclass:** This Subclass consists of all Alabama insureds whose vehicles received CCC Reports with Adjusted Vehicle Values which were less than Actual Cash Value as established by Guidebooks.

98.     **Numerosity:** Both Subclasses are numerous that joinder of all affected persons would be impracticable. Although the exact number of Subclass Members is unknown, the Alabama Subclasses are estimated to comprise many thousands of people who have sustained total losses to their vehicles while insured by Allstate.

99.     **Commonality:** Numerous questions of law and fact are common to Plaintiff and the Class, and predominate over any individual questions. These legal and factual questions include, but are not limited to:

a)      Whether Allstate failed to properly investigate and determine that CCC Reports and CCC's Methodology are statistically invalid;

b)      Whether Allstate has actual knowledge that CCC Reports and CCC's Methodology are statistically invalid;

c)      Whether Allstate's Alabama Policy required it to pay Actual Cash Value to its Alabama insureds on a basis that was statistically valid;

d)      Whether Allstate breached its contracts of insurance with its Alabama insureds by improperly underpaying total loss claims through the use of statistically invalid CCC Reports and CCC's Methodology;

e)      Whether Allstate failed to pay Actual Cash Value to its Alabama insureds;

f)      Whether CCC Reports and CCC's Methodology properly calculate the Actual Cash Value of total loss vehicles at the time of the loss;

g)      Whether Allstate has intentionally and systemically underpaid total loss claims to Plaintiff and the Class by using statistically invalid CCC Reports;

h)      Whether Plaintiff and the Class have sustained damages;

i)       Whether Defendants have been unjustly enriched as a result of the scheme described herein; and,

j)       Whether Allstate and CCC have conspired, as alleged herein.

100.    **Typicality:** Plaintiff's claims are typical of the claims of the Class Members, as Plaintiff and all Members of the Class have suffered damages as a result of Defendants' unlawful and deceptive scheme of settling total loss vehicle claims for substantially less than the actual replacement costs of such vehicles. Specifically, the total loss claims of the Class Members were adjusted by Allstate based upon CCC Valuations. The same discovery and evidence that would be used to support Plaintiff's claims will be used to support the claims of the Members of the Class.

101.    **Adequacy of Representation:** Plaintiff will fully and adequately represent and protect the interests of the Class Members because they share common injuries as a result of Defendants' conduct that is applicable to all Members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions. Plaintiff and counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests that are contrary to or in conflict with those of the Class they seek to represent.

102.    **Predominance and Superiority:** This Action is properly maintained as a Class Action pursuant to Fed.R.Civ.P. 23, because questions of law and fact common to Plaintiff's claims and the claims of the Members of the Class predominate over questions of law and fact affecting only individual Members of the Class, such that a class action is superior to other methods for the fair and efficient adjudication of this controversy. The issues in relation to Plaintiff's claims are similar to the issues relating to the claims of the other Members of the Class, such that a class action provides a far more efficient vehicle to resolve the claims rather than a myriad of separate

lawsuits. Accordingly, for most Class Members, a class action is the only mechanism by which they could reasonably expect to vindicate their rights. Certification of the Class under Rule 23 is also supported by the following considerations:

a) The relatively small amount of damages that Members of the Class have suffered on an individual basis would not justify the prosecution of separate lawsuits;

b) Counsel in this Class Action are not aware of any other earlier litigation against Defendants to which any other Members of the Class are a party and in which any question of law or fact controverted in the subject action is to be adjudicated;

c) By virtue of Defendants' efforts to conceal their scheme, many Class Members may not even be aware that they have a claim;

d) The prosecution of separate actions by individual Members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action;

e) Class treatment of predominating common questions of law and fact is superior to multiple individual actions because it would conserve the resources of the courts and the litigants and further the efficient adjudication of Class Member claims; and

f) Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

### Damages Calculations for the Subclasses

103. Calculation of damages for the Condition Adjustment Subclass is readily manageable. Allstate maintains specific information in its electronic database relating to first-party total loss claims identifying each claim in the amount of any negative or downward Condition Adjustments on each such claim.

104.   In addition, Allstate maintains aggregate data on the total amount of negative or downward Condition Adjustments in Alabama (and other states) on an annual basis.

105.   Accordingly, when the Condition Adjustment Subclass establishes that all of the Allstate negative or downward Condition Adjustments are statistically invalid, then each Member of the Condition Adjustment Subclass will be entitled to a refund in the full amount of any such Condition Adjustments. As stated, that amount can be readily determined on an individual basis for each Allstate first-party insured as well as on an aggregate basis.

106.   In a similar matter, the damages recoverable by the Market Valuation Subclass may be readily determined from Allstate's electronic database relating to first-party total loss claims in the state of Alabama.

107.   When the Market Value Subclass establishes that Steps 2, 3, and 4 of the CCC Methodology, and for making Condition Adjustments are invalid and less than Actual Cash Value, then Allstate becomes obligated to pay the total loss claim of each Market Value Subclass Member based upon the Guidebook valuation imbedded in Allstate's electronic database as an alternative and proper determination of Actual Cash Value for each Subclass Member's total loss vehicle.

108.   As in the case of the Condition Adjustment Subclass, such information is readily accessible in Allstate's electronic database, and the proper adjustments for each Member of this Subclass can be readily ascertained and determined from that database on an individual basis.

109.   All of the damages claimed in this action on a class-wide basis are readily and easily ascertainable from the Allstate electronic database relating to its Alabama total loss claims.

110.   Defendants have acted, or refused to act, in a manner that applies generally to the Class, such that final injunctive relief is appropriate as to the Class as a whole.

111.   **Adequacy of Representation:** Plaintiff will fully and adequately represent and protect the interests of the Class Members because they share common injuries as a result of Defendants' conduct that is applicable to all Members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interests that are contrary to or in conflict with those of the Class they seek to represent.

112.   **Predominance and Superiority**: This action is properly maintained as a Class Action pursuant to Rule 23 because questions of law and fact common to Plaintiff's claims and the claims of the Members of the Class predominate over questions of law and fact affecting only individual Members of the Class, such that a Class Action is superior to other methods for the fair and efficient adjudication of this controversy. The issues in relation to Plaintiff's claims are similar to the issues relating to the claims of the other Members of the Class, such that a Class Action provides a far more efficient vehicle to resolve the claims rather than a myriad of separate lawsuits. Accordingly, for most Class Members, a Class Action is the only mechanism by which they could reasonably expect to vindicate their rights. Certification of the Class under Rule 23 is also supported by the following considerations:

   a.   The relatively small amount of damages that Members of the Class have suffered on an individual basis would not justify the prosecution of separate lawsuits;

   b.   Counsel in this Class Action are not aware of any other earlier litigation against Defendants to which any other Members of the Class are a party and in which any question of law or fact controverted in the subject action is to be adjudicated;

       c.      By virtue of Defendants' efforts to conceal their scheme, many Class Members may not even be aware that they have claims against Defendants;

       d.      The prosecution of separate actions by individual Members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action;

       e.      Class treatment of predominating common questions of law and fact is superior to multiple individual actions because it would conserve the resources of the courts and the litigants and further the efficient adjudication of the Class Members' claims; and

       f.      Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude their maintenance as a class action.

### Count I – Breach of Contract Against Allstate

113.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 112 as though fully set forth herein.

114.    The Allstate Policy issued to Plaintiff constitutes a valid and binding contract.

115.    Allstate has breached its Policy with Plaintiff in multiple ways, resulting in the material underpayment of Plaintiff's total loss claims, which include, but are not limited to: (a) failure to properly investigate and confirm the statistical validity of the CCC Valuation Methodology; (b) improper delegation of its obligation to value total loss vehicles, including Plaintiff's vehicle, to CCC; and (c) wrongful failure to properly adjust and pay the amounts due and owed to Plaintiff for his total loss vehicle, sufficient for Plaintiff to obtain a comparable replacement vehicle.

116.    Specifically, Allstate has failed to pay Actual Cash Value as required by its Policy to Plaintiff and to Class Members.

117.     Allstate's breach proximately caused Plaintiff's actual damages and the actual damages of the Class. Thus, Allstate is liable for compensatory, consequential and incidental damages flowing from its breach of the Policy, as well as attorneys' fees and interest.

118.     This claim applies to all Class Members.

**Count II – Tortious Interference with Performance of a Contract Against CCC**

119.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 112 as though fully set forth herein.

120.     The Policy obligated Allstate to properly investigate the value of Plaintiff's total loss claims using a fair and statistically valid valuation system or methodology, and then to properly pay Plaintiff the appropriate value of his total loss.

121.     At all times relevant hereto, CCC had knowledge that Allstate entered into such Policies with its insureds and that the Policies obligated Allstate to promptly and properly pay total loss claims. This knowledge is demonstrated by the fact that CCC prepared the CCC Market Valuation Report, which specifically identified Plaintiff and specifically valued Plaintiff's vehicle.

122.     CCC had actual knowledge that Allstate used the CCC Valuations to adjust the total loss claims of Allstate insureds, including Plaintiff's claim.

123.     CCC also had actual knowledge that Allstate typically would refuse to increase total loss valuations beyond the CCC Valuations and that Allstate settled the majority of its total loss claims based upon CCC Valuations.

124.     CCC wrongfully interfered with Allstate's contractual obligations to Plaintiff by knowingly and intentionally providing Allstate with a statistically invalid and wholly arbitrary total loss valuation for the specific purpose of enabling Allstate to underpay the claims of total loss insureds, including Plaintiff's claim.

125.    Allstate's breaches that were caused by CCC's unjustified, intentional and malicious interference with Plaintiff's contractual rights under the Policy include: (a) failing to properly value Plaintiff' total losses; (b) using arbitrary and statistically invalid methodology to value Plaintiff' total loss claims; and (c) causing Allstate to fail to pay the proper amount due and owed to Plaintiff.

126.    Plaintiff suffered damages as a proximate result of CCC's improper CCC Valuations and resulting tortious interference with the contractual relationship between Allstate and Plaintiff and the Class. Therefore, Plaintiff is entitled to recover compensatory and punitive damages, as well as any other such damages, costs or attorneys' fees to which he may be entitled under Alabama law.

127.    This claim applies to all Class Members.

**Count III – Breach of Contract Claim Against CCC Arising from Plaintiffs' Status as Third-Party Beneficiaries of the Agreement Between Allstate and CCC**

128.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 112 as though fully set forth herein.

129.    At all times relevant hereto, CCC contracted to provide Allstate with total loss valuations (the "Agreement"). The intended purpose of this Agreement was to outsource Allstate's valuation of total loss claims for the purpose of satisfying the obligations of Allstate to value and pay total loss claims.

130.    As insureds for whom valuations were prepared under this Agreement, Plaintiff and the Class are intended beneficiaries of the Agreement between Allstate and CCC, and are entitled to sue for breach of that Agreement.

131.    Plaintiff alleges that CCC breached this Agreement by providing Allstate with total loss valuations that were not statistically valid and were wholly arbitrary in the manner in which

Allstate valued total losses, including Plaintiff's total loss claims. The improper CCC Valuations were supplied to Allstate by CCC in the course of business for the purported direct benefit of Plaintiff and the Class.

132.    CCC's breach of its Agreement to provide valid total loss valuations to Allstate proximately caused damage to Plaintiff.  CCC is, therefore, liable to Plaintiff and the Class as intended third-party beneficiaries for compensatory and consequential damages flowing from said breaches.

133.    This claim applies to all Class Members.

### Count IV – Bad Faith Claim Against Allstate

134.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 112 of this Complaint.

135.    Alabama law recognizes the tort of bad faith, which has different options for proof, namely, proof of a "normal" bad faith claim or, alternatively, an "abnormal" bad faith claim. *Coleman v. Unum Group Corp.*, 207 F.Supp.3d 1281, 1284 (S.D. Al. 2016) (quoting *State Farm Fire and Casualty Company v. Brechbill*, 144 So.3d, 248, 257-258 (Al. 2013).

136.    Specifically, Allstate will not be able to demonstrate that it is entitled to judgment as a matter of law on its underlying breach of contract claim at any point in this litigation up through and including jury verdict.  This is the standard for a normal bad faith claim.

137.    Specifically, Allstate had actual knowledge at all relevant times that the CCC valuation methodology was statistically invalid, did not properly calculate Actual Cash Value and resulted in the significant underpayment of total loss claims.

138.    Allstate intentionally disregarded these facts and, with full knowledge that CCC Reports did not properly determine Actual Cash Value, elected to utilize these CCC Reports to

adjust total loss claims for the specific purpose of reducing the individual and aggregate amount of Allstate's total loss claims expense.

139.    Allstate knowingly and intentionally refused to use proper third party sources of valid total loss valuations because using such sources would have cost Allstate more money if it paid Actual Cash Value to its first party insureds such as Plaintiff.

140.    Allstate is also liable to Plaintiff and the Class Members based on proof of its "abnormal" bad faith case. This proof involves Allstate's knowing and intentional failure to properly investigate the total loss claims of Plaintiff and the Class Members.

141.    Specifically, Allstate provided no independent analysis to determine Actual Cash Value as required by the Policy.  Rather, Allstate merely transmitted to CCC electronically its adjusters' visual evaluation of the condition of total loss vehicles and identifying characteristics such as the VIN number.

142.    In so doing, however, Allstate made no effort whatever to make any actual or independent calculation or determination of the proper dollar amount of Actual Cash Value but rather deferred entirely to the valuations in the CCC Reports, which Allstate knew to be statistically invalid and to improperly undervalue the total loss claims of Plaintiff and the Class Members.

143.    This claim applies to all Class Members.

### Count V – Civil Conspiracy Against Allstate and CCC

144.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 112 as though fully set forth herein.

145.    Allstate and CCC entered into an illicit agreement and conspiracy to utilize CCC Valuations to provide improper total loss valuations. Specifically, Allstate and CCC conspired to underpay Plaintiff and the Class by using CCC Valuations, which included the aforementioned

statistically invalid Four Steps, which were not intended to calculate the fair value of total loss vehicles, but rather to improperly undervalue total loss claims of Allstate insureds.

146.    Allstate is a part of the conspiracy by reason of having actual knowledge that the CCC Valuations provided were statically invalid and continuing to utilize the CCC Valuations when determining the payment of Plaintiff and Class Members' total loss claims.

147.    Allstate's conspiracy with CCC to use the invalid CCC Valuation Methodology deprived Plaintiff and the Class of the proper value of their total losses. The overt acts emanating from Defendants' illicit agreement to so deprive Plaintiff and the Class include, but are not limited to, CCC's undervaluation of Plaintiff's claims using CCC Valuations, and Allstate's failure to properly investigate, adjust and pay such claims directly resulting from the CCC Valuations.

148.    Plaintiff and Class Members have been damaged as a proximate result of Defendants' illicit agreement and conspiracy. Therefore, Allstate and CCC are each liable for the torts of one another arising out of their conspiracy as defined herein, and Plaintiff and Class Members are entitled to recover compensatory and punitive damages against Allstate and CCC.

149.    This claim applies to all Class Members.

### Prayer for Relief

**WHEREFORE,** Plaintiff David A. Walker respectfully requests that this Honorable Court:

A.    Certify the Class alleged herein;

B.    Appoint Plaintiff as Class Representative;

C.    Appoint the undersigned as Class Counsel;

D.    Award Plaintiff and Class Members actual damages in such amount as the Court or Jury may determine;

E.   Award declaratory and injunctive relief as permitted by law;

F.   Award punitive damages as permitted by law;

G.   Award reasonable attorneys' fees, filing fees, expert fees, litigation costs and expenses to counsel based upon the benefit received by Plaintiff and the Class; and

H.   Award Plaintiff and Class Members any additional relief as this Court deems just and proper, including injunctive relief to prohibit Allstate from continuing to utilize CCC Valuations in Alabama.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts for which a trial by jury is permitted by law.

Done this 16th day of August, 2019.

/s/John A. Yanchunis
John A. Yanchunis
Jonathan B. Cohen
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-2434
jcohen@forthepeople.com
jyanchunis@forthepeople.com

Jonathan H. Waller (WAL073)
Waller Law Office, PC
2001 Park Place, Suite 900
Birmingham, AL 35203
Telephone: (205) 313-7330
jwaller@waller-law.com

Clay C. Arnold (*Admitted PHV*)
Joshua H. Watson (*Admitted PHV*)
Arnold Law Firm
865 Howe Avenue
Sacramento, CA 95825
Telephone:  (916) 777-7777
Facsimile:  (916) 924-1829

clayeo@hotmail.com
jwatson@justice4you.com

***Attorneys for Plaintiff, David A. Walker***

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2019, a true and correct copy of the above and foregoing was filed with the Clerk of Court using the CM/ECF electronic filing system, which will send notification to the following counsel of record:

Henry T. Morrissette
hmorrissette@handarendall.com
HAND ARENDALL HARRISON SALE LLC
P.O. Box 123
Mobile, AL 36601
(251) 432-5511

John E. Rollins
Jrollins@handarendall.com
Hand Arendall Harrison Sale LLC
1801 5th Ave North
Suite 400
Birmingham, AL 35203

Mark L. Hanover
mark.hanover@dentons.com
Kathleen V. Kinsella
Kathleen.kinsella@dentons.com
DENTONS US, LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
(312) 876-8000

***Attorneys for Allstate Property and Casualty Insurance Company***

Robert H. Rutherford
robert.rutherford@burr.com
Burr & Forman LLP
420 North 20th Street
Suite 3400, Wells Fargo Tower
Birmingham, AL 35203

Marguerite M. Sullivan
marguerite.sullivan@lw.com
Jason R. Burt
jason.burt@lw.com
Latham & Watkins, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200

Kathleen P. Lally
kathleen.lally@lw.com
Robert C. Collins, III
robert.collins@lw.com
Latham & Watkins, LLP
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

***Attorneys for CCC Information Services, Inc.***

/s/John A. Yanchunis
Of Counsel